# AFFIDAVIT OF SPECIAL AGENT TIMOTHY S. BARTH IN SUPPORT OF AN APPLICATION FOR CRIMINAL COMPLAINT

I, Timothy S. Barth, state:

## *INTRODUCTION AND AGENT BACKGROUND*

1. I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation ("FBI"). I have been employed by the FBI since September, 2019. I have a Bachelor of Arts degree in Adolescent Education & History from St. John Fisher College in Rochester, New York, and a Master of Science degree in Sport Management from the State University of New York at Cortland, Cortland, New York. Prior to my employment with the FBI, I spent nine years as an educator working at both secondary and higher education institutions.

2. I am a graduate of the FBI Academy in Quantico, Virginia. Since my training at the FBI Academy, I have gained experience as a Special Agent on a variety of investigations and prosecuted matters utilizing a variety of investigative techniques, including interviewing witnesses, gathering evidence, executing search warrants, and reviewing various forms of evidence, including telephone call detail records to include SMS detail as well as data sessions, internet protocol ("IP") addresses and access logs, billing records, and other business records.

3. I make this affidavit in support of an application for a criminal complaint charging Lynn CLARK ("CLARK") with providing a false statement, in violation of 18 U.S.C. § 1001.

1

4. The facts in this affidavit come from my personal observations, review of records, interviews of witnesses, my training and experience, and information obtained from other agents. This affidavit is intended to support the application for a criminal complaint and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5. Title 18, United States Code, Section 1001(a)(2) provides: "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully… makes any materially false, fictitious or fraudulent statement or representation," shall be punished. As set out *infra*, I believe that CLARK violated this statute when she provided several false statements to Special Agents of the FBI stating that: (1) she did not know who sent threatening text messages when, in fact, she knew that she had sent the threatening text messages; and (2) she did not download a phone application that allowed her to disguise her true phone number when sending the threatening text messages, when, in fact, she had downloaded the phone application.

## *Lynn CLARK*

6. CLARK is a resident of Belchertown, Massachusetts and is employed as the Superintendent of the Chicopee Public Schools. This investigation has revealed that CLARK sent 99 text messages that were threatening in nature using an application that disguised her phone number, falsely denied doing so, and attempted to cast suspicion onto other employees of the City of Chicopee (the "City") and a member of her family. These false statements materially affected the FBI's investigation into the alleged extortion of a City employee.

2

### *The alleged extortion of INDIVIDUAL 1*

7. On December 3, 2021, the City's Mayor reported to the FBI that the City was in the process of hiring a new Police Chief and that he believed a candidate to fill that position (hereinafter referred to as "INDIVIDUAL 1") was the victim of threats intended to force INDIVIDUAL 1 to withdraw his/her candidacy for the position. The Mayor reported that INDIVIDUAL 1 withdrew his/her application from consideration as a result of these threats. The Mayor informed agents that he was concerned that the threats and INDIVIDUAL 1's subsequent withdrawal unfairly affected the integrity of the selection process, so he delayed selecting a new Chief until the City determined who threatened INDIVIDUAL 1.

8. Agents interviewed INDIVIDUAL 1 on December 8, 2021. At that time, INDIVIDUAL 1 reported that he/she applied to be the City's Police Chief and that the application was pending in November 2021. The application process was competitive, and several of INDIVIDUAL 1's colleagues also applied for the position. In November 2021, INDIVIDUAL 1 received numerous text messages from anonymous numbers containing threats to expose information that would cause reputational harm to INDIVIDUAL 1 if INDIVIDUAL 1 did not withdraw his/her application. As a result of the threats, INDIVIDUAL 1 withdrew his/her application.

9. INDIVIDUAL 1 further reported that some of these messages contained private material that INDIVIDUAL 1 had previously sent to CLARK using his/her personal e-mail account. INDIVIDUAL 1 stated that the only person with whom he/she had shared this information was CLARK. INDIVIDUAL 1 believed CLARK had also received threatening messages from anonymous numbers. CLARK forwarded messages she had received to

3

INDIVIDUAL 1, at least one of which read, "have [him/her] bow out." INDIVIDUAL 1 understood this to be an instruction to CLARK to pressure INDIVIDUAL 1 to withdraw INDIVIDUAL 1's application for Police Chief. CLARK also showed INDIVIDUAL 1 a text message from an anonymous number containing an image of a photograph depicting INDIVIDUAL 1 and INDIVIDUAL 1's spouse that was taken at a wedding (hereinafter referred to as "the wedding picture"). INDIVIDUAL 1 believed that the only copy of this photograph was stored in his/her locked office, and he/she believed the picture did not exist in digital form.

10. Messages from the anonymous numbers were also sent to INDIVIDUAL 1's spouse. During the interview with INDIVIDUAL 1, he/she stated that he/she maintained all of the messages that he/she received from the anonymous numbers but deleted messages that CLARK received and subsequently forwarded to INDIVIDUAL 1. INDIVIDUAL 1 consented to a search of his/her cellular telephone and allowed agents to extract and view the messages from the anonymous numbers that remained on INDIVIDUAL 1's cellular telephone.

11. During an FBI interview of INDIVIDUAL 1 on February 8, 2022, INDIVIDUAL 1 expressed that he/she felt that the messages were sent with the intention of intimidating INDIVIDUAL 1 into withdrawing his/her application from consideration for the position of Police Chief.

***CLARK voluntarily meets with and provides a statement to Special Agents of the FBI***

12. CLARK voluntarily came into the FBI Springfield Resident Agency on December 6, 2021 and January 11, 2022 to speak to agents about the text messages that she and INDIVIDUAL 1 had received. During the December 6, 2021 interview, CLARK stated:

a. CLARK's cellular telephone number was 413-XXX-0747[1] (hereinafter the "CLARK personal cell phone").

b. CLARK first received threatening messages from unknown numbers on November 6, 2021.

c. CLARK received six messages over a period of several days from different phone numbers she did not recognize.

d. CLARK received text messages that referenced the same information that would cause reputational harm to CLARK and INDIVIDUAL 1 that INDIVIDUAL 1 had received.

e. CLARK did not know who sent the threatening messages.

f. CLARK was worried that public disclosure of this information would tarnish her reputation.

g. CLARK received a text message that contained a photograph of INDIVIDUAL 1 driving CLARK's car near a toll plaza (hereinafter referred to as the "toll plaza picture.")

---

[1] Cellular telephone numbers identified in this affidavit are known in full to agents but have been redacted to protect the privacy of the subjects of this affidavit.

    h. CLARK received another text message that contained the wedding picture.[2] CLARK did not know how that image was created and suggested the photograph depicted in the text message could have been stolen from INDIVIDUAL 1's office.

    i. CLARK deleted every text message from her cellular telephone.

    j. One or more of INDIVIDUAL 1's colleagues, several of whom CLARK named, may be responsible for sending the threatening text messages.

13. CLARK subsequently contacted agents and requested a second meeting. During the second meeting, which occurred on January 11, 2022, CLARK stated:

    a. CLARK was concerned that the investigation into the threatening text messages was harming her reputation as the Superintendent of Chicopee Schools.

    b. CLARK was concerned that the investigation was "tearing the city apart."

***The investigation reveals that CLARK sent the threatening text messages***

14. Because the threatening messages had caused INDIVIDUAL 1 to withdraw his/her candidacy from consideration for the Chief of Police position, the City delayed its selection for the position. Because this delay had a significant effect on an essential governmental function, agents pursued a number of investigative steps and allocated substantial resources to determine who sent the messages. Many of the investigative steps

---

[2] This appears to be the same photograph described by INDIVIDUAL 1 that INDIVIDUAL 1 said he/she kept in his/her locked office. *See* ¶ 9.

6

agents took were based, in part, on the information CLARK provided. The investigation has revealed that INDIVIDUAL 1, INDIVIDUAL 1's spouse, and CLARK together received approximately 99 threatening text messages sent by fictitious phone numbers used to disguise the true sender. Each of the fictitious phone numbers were provided by the same mobile application, known colloquially as a "burner app," that allows users to disguise their true phone numbers to send anonymous text messages and make anonymous phone calls (hereinafter referred to as the "burner app").[3]

15. Records from the burner app administrator, cellular service providers, and other sources (collectively referred to as the "records") revealed that each of the threatening messages were sent by phone numbers purchased on the burner app by CLARK (the "CLARK burner accounts") using an Apple wireless device that accessed CLARK's home IP address.

16. The records also revealed that the CLARK burner accounts sent the threatening messages to INDIVIDUAL 1, INDIVIDUAL 1's spouse, and to CLARK herself and sent non-threatening messages to a fourth number, 413-XXX-3312. Records also revealed that

---

[3] The specific burner app used to send these messages is known to agents. The burner app allows a user to purchase phone numbers from which the user can send text messages and make phone calls anonymously by making the message or call appear that it is originating from the number assigned by the burner app, rather than the number that is actually being used. The burner app allows consumers to purchase an unlimited amount of phone numbers and to choose the area codes of the numbers purchased and can be downloaded from the "App Store," and the "Google Play Store." The burner app can also be accessed from any web browser, allowing a consumer to make calls or send text messages from any computer or laptop that has an internet connection.

413-XXX-3312 is subscribed to the Chicopee Department of Public Schools and was assigned to CLARK (hereinafter the "CLARK work cell phone").

17. The records showed that CLARK used the CLARK personal cell phone to access the burner accounts at the same time that the CLARK burner accounts sent messages to INDIVIDUAL 1, INDIVIDUAL 1's spouse, and/or CLARK. The records also revealed that CLARK accessed the CLARK burner accounts using her home internet connection to send messages to INDIVIDUAL 1, INDIVIDUAL 1's spouse, and CLARK herself.

### *CLARK contacts the FBI and expresses concern about the investigation*

18. CLARK emailed me on January 17, 2022, to inform me that her cell phone number had changed. On January 23, 2022 at 11:33 p.m., CLARK emailed me a list of ten topics and concerns that she would like to discuss with me. In this email, CLARK asked what crime had been committed and wrote:

> no matter which person, group of people or individual this [investigation] points to - it was not reported by us and a piece of this was probably self-serving …. I just feel that nothing and I repeat, nothing - will help me personally. How is this helping the City?

CLARK sent me additional emails on January 26 and 27, 2022 asking to meet so we could discuss her concerns. On February 3, 2022, CLARK again emailed me and asked to meet with me on February 7, 2022 at 2:00 p.m. CLARK and I ultimately agreed to meet at that time.

### *CLARK makes false statements and admits sending the threatening text messages*

19. CLARK voluntarily came into the FBI Springfield Resident Agency on February 7, 2022 to speak to me and other agents about the threatening text messages. Agents confirmed that CLARK was speaking to the agents voluntarily, that CLARK could choose

not to answer questions or end the interview at any time, and that she must be truthful. CLARK stated that she understood.

20. At various points during the interview, CLARK attempted to steer the investigation away from the threatening messages and attempted to dissuade agents from pursuing the investigation any further.

21. During the course of the interview, CLARK provided false statements, including that: (1) she did not know who sent the threatening text messages when, in fact, she knew that she had sent the threatening messages; and (2) she did not download the burner app, when in fact, she had downloaded the burner app. CLARK stated:

  a. It was in the best interests of all involved, including the interests of CLARK, INDIVIDUAL 1, and the City, to close the investigation with "no finding."

  b. A particular employee of the City whom she identified by name could be responsible for sending the threatening text messages.[4]

  c. CLARK did not know who sent the threatening text messages.

  d. CLARK did not download the burner app.

  e. CLARK did not recognize the wedding picture.

---

[4] This was the first time CLARK suggested this particular individual could be responsible, but it was not the first time she suggested others could be responsible. CLARK previously suggested colleagues of INDIVIDUAL 1 sent the messages. *See* ¶ 12j.

9

  f. A particular member of CLARK's family whom she identified by name could be responsible for sending the threatening text messages.[5]

  g. CLARK understood that by providing false information to agents, or by casting suspicion onto individuals who were not involved with sending the threatening text messages, CLARK could be changing the course of the investigation, possibly in a way that would make it more difficult for agents to identify the individual who sent the messages.

22. Agents then confronted CLARK with the information, detailed *supra*, that clearly demonstrated that CLARK downloaded the burner app and sent the threatening text messages to INVIDIVIDUAL 1, INDIVIDUAL 1's spouse, and to the CLARK personal cell phone. Subsequently, CLARK stated:

  a. CLARK downloaded the burner app.

  b. CLARK sent the threatening text messages because: she felt if INDIVIDUAL 1 became Police Chief, it could negatively impact CLARK's position as Superintendent of Chicopee Schools; CLARK felt INDIVIDUAL 1 had achieved many accomplishments based on CLARK's work; and CLARK wanted INDIVIDUAL 1 to get "knocked down a peg."

  c. CLARK hid the burner app from others by saving it in a covert location on her phone or computer and by deleting it and downloading it again at a later time.

---

[5] Agents spoke to this family member on February 9, 2022. During that interview, the family member denied ever possessing the CLARK personal cell phone and/or the CLARK work cell phone.

    d. CLARK used similar burner apps in her capacity as the Superintendent of Chicopee Public Schools to contact parents of students when they were unresponsive to calls made from a number associated with the public schools.

    e. CLARK sent text messages to INDIVIDUAL 1 using other applications similar to the burner app to disguise her phone number.

    f. CLARK found the wedding picture on the internet and took a picture of it using her cell phone. CLARK sent a text message through the burner app containing that picture to the CLARK personal cell phone and showed it to INDIVIDUAL 1. CLARK told INDIVIDUAL 1 that she did not know who sent the picture to her.

    g. CLARK sent the toll plaza picture to the CLARK personal cell phone using the burner app. CLARK then showed this picture to INDIVIDUAL 1 and claimed that CLARK received it from an unknown phone number.[6] The original photograph was in CLARK's possession.

## CONCLUSION

23. Based on my training, experience, and what I have learned during this investigation, I believe that CLARK created many phone numbers using her burner accounts to conceal her true phone number and sent each of the threatening text messages to

---

[6] This investigation has revealed that the photograph was taken by an automated toll system operated by the New Jersey Turnpike Authority when CLARK's vehicle passed through a toll gantry. The New Jersey Turnpike Authority sent this photograph to CLARK in relation to a demand for payment of tolls. CLARK showed this picture to INDIVIDUAL 1 to further threaten INDIVIDUAL 1 and cast suspicion onto others.

INIDIVIDUAL 1, INDIVIDUAL 1's spouse, and the CLARK personal cell phone. I further believe that CLARK sent messages to herself as a means of casting suspicion onto others and to make herself appear as a victim. Based on the information described *supra*, there is probable cause to believe that CLARK committed the crime of making a false statement, in violation of 18 U.S.C. § 1001(a)(2).

Respectfully submitted,

*[signature]*
Timothy S. Barth
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 5th day of April, 2022.

*[signature]*
KATHERINE A. ROBERTSON
United States Magistrate Judge